UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**PAUL D. COHN,**

               **Plaintiff,**

                              :

    **v.**

                                         **Case No. 1:19-cv-943**

**WESTERN & SOUTHERN**                  **Judge Sarah D. Morrison**
**FINANCIAL GROUP LONG**
**TERM INCENTIVE AND**        :
**RETENTION PLAN I,** *et al.,*

               **Defendants.**

## OPINION AND ORDER

Plaintiff Paul D. Cohn brings this ERISA action against Defendants Western & Southern Financial Group Long Term Incentive and Retention Plan I (the "Plan") and its sponsor, Western & Southern Financial Group, Inc., after a determination that Mr. Cohn's Plan benefits were the subject of forfeiture and recoupment efforts. (*See* Am. Compl., ECF No. 16.) The Administrative Record was filed under seal (Admin. R. Pt. 1, ECF No. 11; Admin. R. Pt. 2, ECF No. 23) and the parties moved for judgment thereon (Pl.'s Mot., ECF No. 24; Defs.' Mot., ECF No. 25). Mr. Cohn and Defendants have each responded to the other's motion (ECF Nos. 26, 28), and replied in support of their own (ECF Nos. 28, 31). The matter is now ripe for consideration.

For the reasons set forth below, Mr. Cohn's Motion for Judgment on the Administrative Record (ECF No. 24) is **DENIED** as to the forfeiture of Units

remaining in the Plan and **GRANTED** as to recoupment of benefits already distributed**,** and Defendants' Motion for Judgment on the Administrative Record (ECF No. 25) is **GRANTED** as to the forfeiture and **DENIED** as to recoupment.

## I.    FACTUAL BACKGROUND

### A.    Mr. Cohn was employed as Managing Director of Fort Washington's Private Equity Team for 12 years.

From 2006 to 2018, Mr. Cohn was employed as Managing Director of the Private Equity Team at Fort Washington Investment Advisors Inc., a subsidiary of Western & Southern. (Am. Compl., ECF No. 16, ¶ 6.) Mr. Cohn describes his work as follows:

> Within [Fort Washington's] Private Equity unit, Mr. Cohn was on the secondary investment team.
>
> As part of the secondary investment team, Mr. Cohn assisted General Partners ("GP") and Limited Partners ("LP") with their private equity investments. For LP's, the secondary team would often find solutions to provide liquidity. For GP's the secondary team might provide restructuring solutions to allow GPs more time to mature their fund holdings with new incentives in place and/or to provide "dry powder" to protect promising investments. These are very sophisticated services and Mr. Cohn operated at a high level and was very successful for [Fort Washington].

(Admin. R. Pt. 1, PAGEID # 393.)

Mr. Cohn left employment with Fort Washington in October 2018 due to his frustration relating to compensation matters. (*Id*., PAGEID # 396.)

### B.    Over the course of his employment, Mr. Cohn was awarded 160 Performance Units under the Plan.

Notwithstanding his ultimate frustration, Mr. Cohn was highly compensated by Fort Washington. As a component of his compensation, he was invited to

participate in the Plan. (Pl.'s Mot., 3.) The Plan is a "top hat" plan[1] reserved for only

the highest earning employees of Western & Southern. During his tenure, Mr. Cohn

was awarded 160 Performance Units under the Plan. (Admin. R. Pt. 1, PAGEID

# 265.) As of his termination, 117.2 Units had vested. (*Id*.) Of those, 57 Units

(valued at $ 304,146.00) had been paid out in accordance with Mr. Cohn's written

distribution election. (*Id*., PAGEID # 265, 358, 360.)

> ### C. Western & Southern learned that Mr. Cohn began a competing enterprise, and exercised the Plan's forfeiture provision. Mr. Cohn appealed the determination, which was upheld by the Executive Committee.

On May 31, 2019, Western & Southern's Senior Vice President for

Compensation & Benefits wrote Mr. Cohn, stating that the balance of his

Performance Unit Account was forfeited and that his distributed Plan benefits were

subject to recoupment. (*Id*., PAGEID # 265–67.) The letter attributed the forfeiture

---

[1] ERISA defines a "top hat" plan as "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. § 1051(2). Top hat plans are exempt from certain of ERISA's requirements. *See* 29 U.S.C. § 1051. The Sixth Circuit has explained:

> The purpose of the "top hat" exception to ERISA coverage has been characterized by the Department of Labor as a recognition by Congress "that certain individuals, by virtue of their positions or compensation level, have the ability to affect or substantially influence, through negotiations or otherwise, the design and operation of their deferred compensation plan . . . and would, therefore, not need the substantive rights and protections of" ERISA.

*Bakri v. Venture Mfg. Co.*, 473 F.3d 677, 678 (6th Cir. 2007) (citing DOL, Office of Pension & Welfare Benefit Programs, Opinion 90–14A, 1990 WL 12393,3 at *1 (May 8, 1990)).

to Mr. Cohn's "business relationship or employment" with a competitor called Tail End Capital Partners, and cited the provision of the Plan disallowing such competition within three years of termination. (*Id.*)

Mr. Cohn requested the documents that formed the basis of the benefit determination. (*Id.*, PAGEID # 268.) In response, he received:

- A Foreign Registration Statement filed with the Pennsylvania Department of State for Tail End Managing Member I, LLC. (*Id.*, PAGEID # 373–74.) The Statement identifies Tail End Managing Member I, LLC as a Delaware limited liability company seeking to do business in Pennsylvania. It is dated April 29, 2019, and signed by Mr. Cohn as Sole Member.

- Print-outs of a website for an entity called RIVVER, identifying Mr. Cohn as an "Advisor" and Tail End Capital Partners as a "Partner." (*Id.*, PAGEID # 375–76.) Mr. Cohn's photo is accompanied by the following:

    > 30-year Private Equity and Secondary Markets veteran. Former Managing Partner at Fort Washington Investment Advisors ($3.2B AUM). Currently managing partner at Tail End Capital Partners.

    The following Tail End Capital Partners logo also appears:

    

- Print-outs of Mr. Cohn's LinkedIn profile, listing Mr. Cohn's post-Fort Washington employment as "Managing Partner" at "Investor." (*Id.*, PAGEID # 378–88.)

Mr. Cohn appealed to Western & Southern's Executive Committee on August 15, 2019. (*See id.*, PAGEID # 393.) He argued that he was not, in fact, working for a competitor:

> Mr. Cohn has been unemployed since leaving [Fort Washington]. Mr. Cohn has considered the creation of a private equity fund through the entity he created, "Tail End Capital Partners" but Tail End has not generated any revenue at this time. In fact, Mr. Cohn has had no employment income since he left [Western & Southern]. . . . [S]ince leaving [Fort Washington], Mr. Cohn has taken great efforts to treat [Fort Washington] fairly. Mr. Cohn has not taken any action to take either investors or deals from [Fort Washington]. In fact, Mr. Cohn has not reached out to any of the [Fort Washington] investors or the "gatekeeper" or consulting community where [Fort Washington] markets its funds. Mr. Cohn's activities also have not impacted any deal flow for [Fort Washington]. Further, Mr. Cohn has not solicited any employees from [Fort Washington] and has not engaged in any disparagement of [Fort Washington] in the marketplace.

(*Id.*, PAGEID # 396.)

The Executive Committee was unconvinced. (*See id.*, PAGEID # 457.) In its October 7, 2019 determination, the Executive Committee found "that Mr. Cohn entered into a business which is both competitive with and similar to the business of" Fort Washington. (*Id.*, PAGEID # 458.) The Executive Committee noted "that according to the Tail End Capital Partners' website, Tail End Capital Partners is an investment management firm involved in private equity." (*Id.*, PAGEID # 459.) In concluding that Tail End Capital Partners was "competitive with and similar to the business of Fort Washington," the Executive Committee "d[id] not find it relevant as to whether Tail End Capital Partners ha[d] generated revenue at [that] time." (*Id.*) The Executive Committee concluded that, pursuant to the Plan, Mr. Cohn's Performance Unit Account balance was forfeited and benefits paid out of the Plan were required to be returned. (*Id.*)

**D.    Mr. Cohn files suit under ERISA.**

Shortly after receiving the Executive Committee's decision, Mr. Cohn filed this action under Section 502 of the Employee Retirement Income Security Act of 1974 ("ERISA") [29 U.S.C. § 1132]. (*See* ECF No. 1. *See also* Am. Compl., ¶ 4.) The operative Complaint asserts two counts. (*See* Am. Compl.) In Count One, Mr. Cohn alleges that he was deprived of a full and fair review of the initial benefit determination, as required under ERISA § 503 [29 U.S.C. § 1133] and 29 C.F.R. 2560.503-1(h)(2). (*Id.*, ¶¶ 53–56.) In Count Two, Mr. Cohn challenges the denial of benefits under the Plan. (*Id.*, ¶¶ 57–66.)

**E.    Relevant Plan Terms**

The Administrative Record includes three amended and restated Plan documents, seven snap-on amendments, and two Summary Plan Descriptions. (*See* Admin. R. Pt. 1; Admin. R. Pt. 2.) Though neither party raises it as a concern, there is reason to suspect that the Record is incomplete.[2] All three restatements suggest that the Plan was established prior to 2005, but the oldest restatement in the Record was signed on October 31, 2008. (2008 Restatement, PAGEID # 335.) The Record also includes a restatement dated April 30, 2010 (2010 Restatement, PAGEID # 313) and another dated May 21, 2014 (2014 Restatement, PAGEID # 281). Crucially, the Plan document in effect as of Mr. Cohn's first three Performance

---

[2] The parties litigated a different issue related to the disclosure of documents. Ultimately, this Court ordered Defendants to produce certain documents, which now comprise Admin. R. Pt. 2. (*See* ECF Nos. 17, 20.)

Unit awards (July 24, 2006, March 1, 2007, and March 1, 2008) is missing, as is Mr.

Cohn's written distribution election. (*See* Admin. R. Pt. 1, PAGEID # 265.)

The 2008 Restatement, 2010 Restatement, and 2014 Restatement differ in

important ways. But, for the sake of providing context and background, the 2014

Restatement provides in relevant part as follows:

### PURPOSE

The Western & Southern Financial Group Long Term Incentive and Retention Plan I ("Plan") is designed to provide an incentive for selected key employees of the Western & Southern Financial Group to maximize performance and remain with the organization, and to enable the Western & Southern Financial Group to attract well-qualified candidates. This is an amended and restated plan. The Plan shall at all times be administered and interpreted in such a manner as to constitute an unfunded nonqualified deferred compensation arrangement for tax purposes and for purposes of Title I of ERISA. This Plan is intended to comply with and shall be interpreted in accordance with Section 409A of the Internal Revenue Code and official guidance issued thereunder.

\* \* \*

**2.1 Eligibility.** Each Employee whose annual Compensation is in the top five percent (5%) for all Employees as of the end of the prior calendar year shall be eligible to be considered for participation in the Plan.

\* \* \*

**4.7 Forfeitures.** The contingent right of a Participant or Beneficiary to receive future payments hereunder and to maintain those benefits paid under the Plan with respect to both vested and nonvested Performance Units shall be forfeited, and, in the case of benefits payable or paid, shall be subject to cancellation, recoupment, rescission, payback or other action to be taken by the Company, upon the occurrence of any one or more of the following events:

(a) If the Participant is involuntarily terminated from employment for Cause by the Company or any Affiliate; or

7

(b) If the Participant, as of the later of, (1) within three years after termination of employment with the Company or any Affiliate, or (2) on or before the completion of distributions with respect to the vested Performance Units in his Account, (x) enters into a business or employment which is competitive with or similar to the business of the Company or any Affiliate, (y) solicits the Company's or any Affiliates' employees, agents or clients to work for or buy products from, or (z) acts in any other way which, had the Participant been employed with the Company or any Affiliate, would have provided the Company with "Cause" to terminate such Participant's employment.

However, the Executive Committee may, in its sole discretion, waive or reduce the forfeiture of payments described above.

Each Participant expressly consents to the Company's application, implementation, and enforcement of this Section 4.7, and expressly agrees that the Company may take such actions as are necessary to effectuate the provisions of this Section 4.7 without further consent or action being required by the Participant.

In addition to the above provisions, nonvested Performance Units shall be forfeited upon a Participant's voluntary termination of employment or for any non-Cause termination.

Performance Units related to forfeited payments shall remain in the Plan and may be awarded by the Executive Committee to other Participants at a later time.

\* \* \*

## ARTICLE V
## AMENDMENT AND TERMINATION

The Company reserves the right at any time and from time to time, to terminate or amend this Plan in writing. However, any termination or amendment shall not alter a Participant's right to Performance Units that were awarded prior to such action as provided by the terms of the Plan prior to such termination or amendment.

\* \* \*

**6.3 Powers.** The Executive Committee or such other department or committee of the Company as the Executive Committee shall designate shall have the discretionary authority to determine eligibility for benefits and to construe the terms of the Plan. Benefits under this

8

Plan shall be paid only if the Executive Committee or its designee decides in its discretion that the applicant is entitled to them under the terms of this Plan. The Executive Committee or such designee shall have such other discretionary authority and powers as may be necessary to enable it to discharge its duties and responsibilities under the Plan, including, but not limited to the power:

(a) to interpret and construe the Plan, including but not limited to the power to determine all questions with regard to employment, eligibility, service, earnings, coverage, benefits, and such factual matters as date of birth and marital status, and similarly related matters for the purpose of the Plan, and the Executive Committee's or its designee's determination of all questions arising under the Plan shall be conclusive upon all persons, the Employer and other interested parties;

(b) to review appeals by Participants from a denial of benefits;

(c) to adopt such rules as it deems appropriate for the administration of the Plan;

(d) to prescribe procedures to be followed by Participants and Beneficiaries filing applications for benefits;

(e) to request from the Employer, Participants and Beneficiaries such information as shall be necessary for proper administration of the Plan;

(f) to prepare and distribute to Participants information explaining the Plan; and

(g) to appoint or employ any advisors to assist in the administration of the Plan, including all the duties described in this Section, and any other agents it deems advisable, including legal, accounting and actuarial counsel.

The decision of the Executive Committee, its designee and the Benefits Department upon any matter within its or their authority shall be final and binding on all parties, including, but not limited to, the Company, Participants, and Beneficiaries.

(2014 Restatement, PAGEID # 281–306.)

## II.   STANDARD OF REVIEW

ERISA benefit determinations are reviewed by the courts under a *de novo* standard—*unless* the plan expressly grants its administrator or fiduciary discretionary authority "to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). *See also Yaeger v. Reliance Std. Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996). If a plan grants discretionary authority, "application of the highly deferential arbitrary and capricious standard of review is appropriate[.]" *Yaeger*, 88 F.3d at 380.

Though the parties agree that the Plan grants the Executive Committee discretionary authority, they dispute the applicable standard of judicial review. Mr. Cohn argues that *Firestone* does not apply to top hat plans, and the Court should proceed with a *de novo* review. (*See* Pl.'s Mot., 13–15.) He cites *Goldstein v. Johnson & Johnson*, 251 F.3d 433 (3d Cir. 2001) for support. Noting that an analogy to trust law provided *Firestone*'s justification for affording deference to a plan administrator's discretionary decisions, the *Goldstein* court concluded that Firestone was "inapplicable" to top hat plans because those plans are more akin to unilateral contracts than to trusts. *Id.* at 442–443. As Mr. Cohn notes, the Sixth Circuit has not expressly addressed the issue. But this Court has concluded  that *Firestone* applies "even if" the plan is a top hat plan. *Whitescarver v. Sabin Robbins Paper Co.*, No. C-1-03-911, 2005 WL 8168487, at *4 (S.D. Ohio Apr. 28, 2005) (Dlott, J.) (finding *Goldstein* "to be faulty because it cannot be reconciled with . . . key

provisions" of the *Firestone* decision).[3] The Court sees no reason to alter its prior

conclusion.

"A decision reviewed according to the arbitrary and capricious standard must

be upheld if it results from 'a deliberate principled reasoning process' and is

supported by 'substantial evidence.'" *Schwalm v. Guardian Life Ins. Co. of Am.*, 626

F.3d 299, 308 (6th Cir. 2010) (quoting *Baker v. United Mine Workers of Am. Health*

*& Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)). Judicial review is no "rubber

stamp"—rather the court examines the "quantity and quality of the . . . evidence on

each side." *Id.* (citing *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir.

2006). "[T]hough the [arbitrary and capricious] standard is not without some teeth,

it is not all teeth." *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1049, 1064 (6th

Cir. 2014). "[I]ndications of arbitrary and capricious decisions include a lack of

substantial evidence, a mistake of law, bad faith and a conflict of interest by the

decision-maker." *Zenadocchio v. BAE Sys. Unfunded Welfare Ben. Plan*, 936 F.

Supp. 2d 868, 884 (S.D. Ohio 2013) (Rose, J.) (citing *Caldwell v. Life Ins. Co. of N.*

*Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002)). However, "[w]hen it is possible to offer a

reasoned explanation, based on the evidence, for a particular outcome, that outcome

---

[3] Although *Whitescarver* was affirmed, the Sixth Circuit expressly declined to take up the question of whether "an ERISA top hat plan must be reviewed under a *de novo* standard." *Whitescarver v. Sabin Robbins Paper Co.*, 313 F. App'x 781, 787 (6th Cir. 2008). Of note, the same language that gave the Court of Appeals comfort in applying an arbitrary and capricious standard in *Whitescarver* is also present here. *See id.* at 786–87 ("Where the Plan . . . describes the interpretation reached by the employer/administrator to be 'binding and conclusive,' we can only conclude that the plan meaning is to vest the type of discretion in the Plan Administrator that must be reviewed under an arbitrary and capricious standard.").

is not arbitrary or capricious." *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003) (quoting *Davis v. Kentucky Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989)).

## III.   ANALYSIS

### A.   Count One – Full and Fair Review

As a threshold matter, Mr. Cohn's briefing neither mentions nor argues for any relief on Count One. (*See generally* ECF Nos. 24, 26, 31.) Accordingly, the Court considers the claim abandoned. *Cf. Chic Promotions, Inc. v. Jewelers Mut. Ins. Co.*, No. 1:07cv417, 2009 WL 3126454, at *2 (S.D. Ohio Sept. 24, 2009) (Barrett, J.) (collecting cases).

### B.   Count Two – Benefit Denial

As to Count Two, Mr. Cohn argues that the benefit determination requires review as to (i) the forfeiture of Units still in the Plan and (ii) the recoupment of benefits already paid out of the Plan. The Executive Committee relied on Plan § 4.7 in reaching its conclusion on both forfeiture and recoupment. Mr. Cohn challenges the Executive Committee's interpretation of the Plan's terms as to each.

It is "a fundamental principle of ERISA law—the plain language of the plan controls." *West v. AK Steel Corp. Retirement Accumulation Pension Plan*, 318 F. Supp. 2d 579, 585 (S.D. Ohio 2004) (Beckwith, J.) (citation omitted). Accordingly, the Court's "starting point is the language of the Plan itself." *Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 343 (6th Cir. 2011)

The 2008 Restatement and 2010 Restatement both include the following language at § 4.7:

**4.7 Forfeitures.** The contingent right of a Participant or Beneficiary to receive future payments hereunder with respect to both vested and nonvested Performance Units shall be forfeited upon the occurrence of any one or more of the following events:

> (a) If the Participant is involuntarily terminated from employment for Cause by the Company or any Affiliate; or

> (b) If the Participant within three years after termination of employment with the Company or any Affiliate (1) enters into a business or employment which is competitive with the business of the Company or any Affiliate, (2) solicits the Company's or any Affiliates' employees, agents or clients to work for or buy products from, or (3) acts in any other way which, had the Participant been employed with the Company or any Affiliate, would have provided the Company with "Cause" to terminate such Participant's employment.

However, the Executive Committee may, in its sole discretion, waive or reduce the forfeiture of payments described above.

In addition to the above provisions, nonvested Performance Units shall be forfeited upon a Participant's voluntary termination of employment or for any non-Cause termination.

Performance Units related to forfeited payments shall remain in the Plan and may be awarded by the Executive Committee to other Participants at a later time.

(Admin. R. Pt. 1, PAGEID # 324–25, 346.) An Amendment to the Plan revised

§ 4.7(b), effective January 1, 2014, to read as follows:

> (b) If the Participant, as of the later of, (1) within three years after termination of employment with the Company or any Affiliate, or (2) on or before the completion of distributions with respect to the vested Performance Units in his Account, (x) enters into a business or employment which is competitive with the business of the Company or any Affiliate, (y) solicits the Company's or any Affiliates' employees, agents or clients to work for or buy products from, or (z) acts in any other way which, had the Participant been employed with the Company or any Affiliate, would have provided the Company with "Cause" to terminate such Participant's employment.

(*Id.*, PAGE ID # 307.) Finally, the 2014 Restatement provides:

13

**4.7 Forfeitures.** The contingent right of a Participant or Beneficiary to receive future payments hereunder and to maintain those benefits paid under the Plan with respect to both vested and nonvested Performance Units shall be forfeited, and, in the case of benefits payable or paid, shall be subject to cancellation, recoupment, rescission, payback or other action to be taken by the Company, upon the occurrence of any one or more of the following events:

> (a) If the Participant is involuntarily terminated from employment for Cause by the Company or any Affiliate; or

> (b) If the Participant, as of the later of, (1) within three years after termination of employment with the Company or any Affiliate, or (2) on or before the completion of distributions with respect to the vested Performance Units in his Account, (x) enters into a business or employment which is competitive with or similar to the business of the Company or any Affiliate, (y) solicits the Company's or any Affiliates' employees, agents or clients to work for or buy products from, or (z) acts in any other way which, had the Participant been employed with the Company or any Affiliate, would have provided the Company with "Cause" to terminate such Participant's employment.

However, the Executive Committee may, in its sole discretion, waive or reduce the forfeiture of payments described above.

Each Participant expressly consents to the Company's application, implementation, and enforcement of this Section 4.7, and expressly agrees that the Company may take such actions as are necessary to effectuate the provisions of this Section 4.7 without further consent or action being required by the Participant.

In addition to the above provisions, nonvested Performance Units shall be forfeited upon a Participant's voluntary termination of employment or for any non-Cause termination.

Performance Units related to forfeited payments shall remain in the Plan and may be awarded by the Executive Committee to other Participants at a later time.

(*Id.*, PAGEID # 294–95.)

All three Restatements expressly state:

[Western & Southern] reserves the right at any time and from time to time, to terminate or amend this Plan in writing. However, any

termination or amendment shall not alter a Participant's right to
Performance Units that were awarded prior to such action as provided
by the terms of the Plan prior to such termination or amendment.

(*Id.*, PAGEID # 297, 326, 348.)

### 1.    The forfeiture decision was not arbitrary or capricious.

Mr. Cohn first challenges the forfeiture of his Performance Unit Account

balance. Based upon the evidence—namely, the RIVVER website, Mr. Cohn's

LinkedIn profile, and the corporate filings for Tail End Managing Member I—the

Western & Southern benefits department, and later the Executive Committee,

determined that Mr. Cohn entered into a competitive business within three years of

termination, triggering § 4.7. Though the precise language of the Plan changed over

time, it was always true that a participant risked forfeiture of future payments

related to vested and nonvested Performance Units if he "enter[ed] into a

business . . . which is competitive with" Western & Southern or any of its affiliates.

Here, the corporate filings support the Executive Committee's conclusion that Mr.

Cohn "entered into a business." And the Tail End Capital Partners logo, which

appears on the RIVVER site and states that the company provides "GP focused

secondary solutions," supports the conclusion that the business was competitive

with Fort Washington's. What's more, the RIVVER site, which lists Mr. Cohn as

Managing Partner of Tail End Capital Partners, may be read as 'filling in the blank'

left on Mr. Cohn's LinkedIn profile, which lists him as Managing Partner of

"Investor." It was reasonable for the Executive Committee to conclude that the

unnamed "Investor" was Tail End Capital Partners. Accordingly, the Court cannot

conclude that the Executive Committee's decision to forfeit Mr. Cohn's Performance Unit Account balance was arbitrary and capricious.

Mr. Cohn argues for the opposite conclusion. Specifically, he asserts that the Executive Committee's decision to forfeit his Performance Unit Account balance was arbitrary and capricious because (i) there is insufficient evidence supporting the decision; (ii) the Executive Committee has a conflict of interest; and (iii) the administrative claim process suffered from "procedural irregularities". (Pl.'s Mot.)

### a) Insufficient Evidence

Mr. Cohn first argues that the evidence in the Administrative Record does not establish that he entered into a competitive or similar business. He notes that dictionary definitions of "business" contemplate "the existence of commercial action or activity for the purpose of monetary gain," but that none of the evidence establishes that Tail End Capital Partners was engaged in commercial activity. (*Id*., 9.) He then defines "competition" and notes that Mr. Cohn

> specifically disclaimed engaging in any competitive activity. He advised [Western & Southern] that he was unemployed, had not generated any employment income or business revenue, had not solicited investors or attempted to take any [Fort Washington] deals, had not spoken to [Fort Washington] investors or other clients where [Fort Washington] markets its funds, nor had he solicited any [Fort Washington] employees to leave employment or disparaged [Fort Washington] or [Western & Southern] in any way.

(*Id*., 10.) At most, he argues, the evidence establishes that Mr. Cohn was "preparing to compete," which is not prohibited under the Plan. (*Id*., 11.)

Mr. Cohn's interpretation of the Plan is cogent and rational. But "equally rational interpretations of a disputed [plan] term . . . [are] insufficient to show that

16

the plan administrator acted arbitrarily or capriciously[.]" *Cultrona v. Nationwide Life Ins. Co.*, 748 F.3d 698, 705 (6th Cir. 2014) (citing *Morgan v. SKF USA, Inc.*, 385 F.3d 989, 992 (6th Cir. 2004)) (internal quotation marks omitted). Instead, courts "are required to resolve a tie in favor of the [p]lan administrator." *Id.* at 705–06. *Cf. Javery v. Lucent Tech., Inc. Long Term Disability Plan*, 741 F.3d 686, 700–701 (6th Cir. 2014) (citing *Tracy v. Pharmacia & Upjohn Absence Payment Plan*, 195 F. App'x 511, 516 n.4 (6th Cir. 2006)) (noting that the plaintiff bears the burden of proof in an ERISA case).

### b) Conflict of interest

Mr. Cohn next argues that the Plan's administration and governance structure warrants an inference that the Executive Committee's decision was arbitrary and capricious. (Pl.'s Mot., 16–17.) He asserts that Western & Southern both administers the Plan and pays Plan benefits; that Plan forfeitures "ha[ve] led to significant cost savings for" Western & Southern; and that members of the Executive Committee have participated or do participate in the Plan. (*Id.*) But Mr. Cohn offers no evidence that the Executive Committee was actually affected by any conflict. *See Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 664 (6th Cir. 2013) (quoting *DeLisle v. Sun Life Assurance Co. of Canada*, 558 F.3d 440, 445 (6th Cir. 2009) ("[T]his court has given greater weight to the conflict-of-interest factor when the claimant 'offers more than conclusory allegations of bias.'"). Accordingly, the Court declines to give the conflict significant weight in its determination.

17

### c) Procedural Irregularities

Finally, Mr. Cohn argues that the process engaged in by the Western & Southern benefits department and Executive Committee was so flawed as to undermine their decision to forfeit his remaining Performance Units. (Pl.'s Mot., 17–18.) In Mr. Cohn's view, these "procedural irregularities" evidence a pretextual determination procedure—in other words, that Western & Southern "had a preconceived result in mind when it sent the [May 31, 2019 letter] and that no information [Mr.] Cohn provided could change its mind thereafter." (*Id.*, 18.) The argument is unavailing.

Mr. Cohn first asserts that the initial investigation into his involvement with Tail End Capital Partners was inadequate. He complains that the investigation took only three days, and that the corpus of evidence "hardly changed over time." (*Id.*, 17.) Mr. Cohn cites no authority for the notion that these facts are problematic, and the Court does not view them as such.

Second, Mr. Cohn notes that Western & Southern refused to produce documents relevant to his benefit denial, as required under ERISA. (*Id.*) Though this Court compelled production of the documents in question (*see* ECF Nos. 17, 20), Mr. Cohn does not identify how the delayed receipt of those documents prejudiced him or otherwise relates to the substantive decision that he forfeit his Performance Unit Account. *Cf. Lake v. Metro. Life Ins. Co.*, 73 F.3d 1372, 1378 (6th Cir. 1996) (noting that "violations of the procedural sections of ERISA do not give rise to claims for substantive damages") (citation omitted).

Third, Mr. Cohn alleges that Western & Southern failed to adequately document the basis for their decision. (Pl.'s Mot., 18.) He focuses on the fact that relevant excerpts from the Tail End Capital Partners website (referenced by the Executive Committee) were not included in the Administrative Record. Any such failure is harmless error. Even without excerpts from the website, the evidence in the Administrative Record is sufficient to uphold the Executive Committee's decision.

Fourth, Mr. Cohn argues that the Executive Committee "ignored evidence and explanations offered" in his appeal. (*Id.*) But the Executive Committee's October 7, 2019 letter belies the assertion. There, the Executive Committee states that it "considered all of your arguments in favor of allowing Mr. Cohn to maintain [Plan] benefits both awarded and paid to him" and "reviewed all points made on behalf of Mr. Cohn in your August 15, 2019 [appeal] letter." (Admin. R. Pt. 1., PAGEID # 457.)

Finally, Mr. Cohn accuses Western & Southern of "lawyering up." (Pl.'s Mot., 18.) He bemoans:

> [Western & Southern] heavily relied on lawyers to make the administrative decision concerning Cohn's benefits, almost completely taking the decision out of the administrator's hands and making the decision one for the law department. **[Western & Southern] strategically used attorneys and the attorney-client privilege so its administrative decision-making could be shielded from review.**

(*Id.*) (internal citation omitted) (emphasis in original). Benefit plans are legal documents—governed by a comprehensive system of laws and regulations—which enshrine legal rights and establish legal obligations. The Court draws no adverse

inference from Western & Southern consulting their lawyers in determining its approach to Mr. Cohn's Plan benefits.

Whether viewed individually or as a whole, the purported irregularities do not give the Court reason to question that the decision to forfeit Mr. Cohn's Performance Unit Account balance was the result of a deliberate, principled reasoning process.

> **2. The recoupment decision was arbitrary and capricious as to Performance Units awarded before the 2014 Restatement.**

Mr. Cohn next challenges Western & Southern's attempt to recoup Plan benefits that had already been distributed to him. The parties principally argue whether Western & Southern has a legal mechanism for effectuating the recoupment. But they put the cart before the horse. Before determining how to recoup distributed benefits, they should have determined whether or not they could.

The 2014 Restatement very clearly authorizes recoupment of distributed Plan benefits, and makes Performance Unit awards subject to those efforts. But before the 2014 Restatement was signed, § 4.7 applied only to the "the contingent right . . . to receive future payments[.]" Pursuant to Article V of the Plan, Performance Units awards could not be further encumbered by later changes to the Plan. In other words, neither the Western & Southern benefits department nor the Executive Committee had authority under the Plan to demand recoupment of any benefit payments attributable to Performance Units awarded to Mr. Cohn before May 21, 2014. Doing so was arbitrary and capricious. *See Univ. Hosps. Of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 849 (6th Cir. 2000) (finding, "[u]pon reviewing the

plain language of the [p]lan," that the plan administrator had "exceeded its power to *interpret* the [p]lan and instead ha[d] effectively *rewritten* it").

### C. Finding and Remand

In view of the above, the Court finds that the Executive Committee's decision to forfeit Mr. Cohn's Performance Unit Account balance was not arbitrary and capricious, but that its decision to demand recoupment of benefits attributable to Performance Units awarded prior to May 21, 2014 cannot stand. "In cases such as these, courts may either award benefits to the claimant or remand to the plan administrator." *Elliott v. Met. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006). Remand is appropriate for "further fact-finding to supplement what [is found to be] an incomplete record." *Javery*, 741 F.3d at 700. It is inappropriate, however, to "afford[ ] the plan administrator a chance to correct its reasoning for rejecting [p]laintiff's application." *Id.*

The Administrative Record is unclear as to whether Mr. Cohn's distributions from the Plan were attributable to Performance Units awarded before or after the 2014 Restatement was signed. Accordingly, further fact finding is necessary and remand is appropriate.

## IV. CONCLUSION

For the reasons set forth above, Mr. Cohn's Motion for Judgment on the Administrative Record (ECF No. 24) is **GRANTED IN PART** and **DENIED IN PART** and Defendants' Motion for Judgment on the Administrative Record (ECF No. 25) is **GRANTED IN PART** and **DENIED IN PART**. The matter is **REMANDED** to the Executive Committee for further proceedings consistent with

this Opinion and Order. The Executive Committee is further **ORDERED** to make such determination **within 90 days** of the date of this Opinion and Order. The Clerk is **DIRECTED** to **TERMINATE** this case from the docket records of the United States District Court for the Southern District of Ohio.

      **IT IS SO ORDERED.**

                                  /s/ Sarah D. Morrison

                                  **SARAH D. MORRISON**
                                  **UNITED STATES DISTRICT JUDGE**